IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DONNA J. VOIGHT            )
                           )
v.                         )      No. 3:04-0241
                           )      Judge Nixon/Brown
JO ANNE B. BARNHART, Commissioner )
of Social Security         )

To:  The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C.
§405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits ("DIB"), as provided under Title II of the
Social Security Act ("the Act"), as amended.  The case is
currently pending on plaintiff's motion for judgment on the
administrative record (Docket Entry No. 17), to which defendant
has responded (Docket Entry No. 22).  For the reasons stated
below, the Magistrate Judge recommends that plaintiff's motion be
**GRANTED**, and that the Commissioner's decision be **REVERSED** and the
cause **REMANDED** for further proceedings consistent with this
report, to include rehearing, supplementation of the medical
record, and the issuance of a new decision.  Should this
recommendation be adopted and approved, it is further recommended
that the case proceed on remand before a different Administrative
Law Judge.

1

Plaintiff filed her DIB application on November 4, 1998 (Tr. 76-79, 84-93). She reported on her initial application that she has been unable to work since May 25, 1998, due to carpal tunnel, heart problems, high blood pressure, degenerative back problems and knee problems (Tr. 76, 85). Plaintiff's application was denied at both the initial and reconsideration levels of agency review (Tr. 33-36, 48-51, 54-55). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which hearing was held on December 6, 1999 (Tr. 232-251). On May 11, 2000, the ALJ issued a written decision finding plaintiff not disabled (Tr. 37-47). Plaintiff took an appeal of this decision to the Appeals Council.

On December 14, 2001, the Appeals Council vacated the ALJ's decision and remanded for a new hearing, supplementation of the record, and a new decision which adequately considers the opinions of plaintiff's treating physician (Tr. 67-68). Pursuant to this order of remand, a second hearing was held before the ALJ on April 23, 2002 (Tr. 252-272), and a second decision denying plaintiff benefits was issued on September 6, 2002 (Tr. 13-23). The ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a
    period of disability and disability insurance benefits

2

set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant has degenerative disc disease of the cervical and lumbar spine, Type II diabetes mellitus, hypertension, history of congestive heart failure, residuals of bilateral carpal tunnel release surgery, degenerative joint disease, and sleep apnea.  These impairments are considered "severe" based on the requirements in 20 CFR § 404.1520(c), but they do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.  The claimant has the residual functional capacity to perform light work.  Specifically, she could lift and carry 20 pounds maximum and 10 pounds frequently.  She could stand or walk for a total of 6 hours in an 8-hour workday and sit for a total of 2 hours in an 8-hour workday.  She should have the option to sit or stand at will and do no repetitive gripping and grasping.

6.  The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

7.  The claimant is an "individual closely approaching advanced age" (20 CFR § 404.1563).

8.  The claimant has a college education (20 CFR § 404.1564).

9.  The claimant has transferable skills from skilled work previously performed as described in the body of the decision (20 CFR § 404.1568).

10. Based upon the limitations above, and considering her age, education, and work experience, the claimant can perform the jobs identified above using Medical-Vocational Rules 202.14 and 202.15 as a framework for decision-making.

3

11.  The claimant was not under a "disability," as defined
     in the Social Security Act, at any time through the
     date of this decision (20 CFR § 404.1520(f)).

(Tr. 22).

        On August 27, 2003, the Appeals Council denied

plaintiff's request for review of the decision of the ALJ (Tr. 7-

8), thereby rendering that decision the final decision of the

Commissioner.   This civil action was thereafter timely filed, and

the Court has jurisdiction.   42 U.S.C. § 405(g).   If the

Commissioner's findings are supported by substantial evidence,

based on the record as a whole, then these findings are

conclusive.   <u>Id.</u>


## II.  REVIEW OF THE RECORD

        On the forms completed in connection with her

application for disability benefits, plaintiff asserted that the

illnesses or conditions which have prevented her from working

since May 25, 1998, include bi-lateral carpal tunnel syndrome,

congestive heart failure, high blood pressure, degenerative back

problems and knee problems (Tr. 52, 56, 85).   To this list of

impairments, plaintiff added diabetes during her December 6, 1999

hearing (Tr. 237) and depression and sleep apnea during her April

23, 2002 hearing (Tr. 260-62, 266).

     A.   <u>Medical Records Related to Carpal Tunnel Syndrome</u>

        Plaintiff was diagnosed with carpal tunnel syndrome in

4

1993 and had a bilateral carpal tunnel release in July of that same year (Tr. 140-47, 154-55). Medical records from W. Cooper Beazley, M.D., the surgeon who performed plaintiff's carpal tunnel release, revealed complaints of post-surgical numbness, tingling and pain (Tr. 148-49).[1] On what appears to be the last treatment note of record for plaintiff from this physician, dated May 13, 1994[2], Dr. Beazley wrote that plaintiff should "[t]ry and get through the rest of the school year, see how she does. If she continues to have this kind of discomfort and problem[s], the reasonable thing for her to do would be maybe just to quit her job [as a Special Education teacher] at that point" (Tr. 148). One month later, on June 9, 1994, plaintiff was evaluated by John McInnis, M.D., an orthopedic surgeon who noted that plaintiff had a satisfactory result from the surgery with some residual numbness (Tr. 156). Dr. McInnis opined that plaintiff should avoid repetitive gripping due to decreased grip strength and should not lift more than fifteen to twenty pounds (Tr. 156).

B.  Medical Records Related to Knee Pain

Based on her complaints of knee pain, plaintiff underwent a venous ultrasound examination on April 10, 1998, which revealed no evidence of deep vein thrombosis (Tr. 157).

_____

[1]Plaintiff also stated at her hearings that, while her carpal release surgery did alleviate some of the pressure, the nerve damage just got worst (Tr. 239, 256).

[2]This treatment note is dated four years prior to plaintiff's last day of work.

5

Two weeks later, plaintiff was seen by John Stanton, M.D., who diagnosed her with bursitis and gave a her a Cortisone and Xylocaine injection (Tr. 164).  On July 27, 1998, Keith Starkweather, M.D., saw plaintiff for a follow-up examination and gave her another Cortisone injection and a prescription for Naprosyn (Tr. 163).  Plaintiff indicated at the time of the injections that she felt improvement and experienced an increased ability to ambulate (Tr. 163-64).  In November 1998, Dr. Stanton reported that plaintiff had full range of motion in both knees (Tr. 165-66).

C.  <u>Medical Records and Limitation Assessments from Primary Care Physician</u>

Paul S. Cha, M.D., plaintiff's primary care physician, provided the agency with plaintiff's medical records dated April 10, 1998 through November 28, 2001 (Tr. 175-204, 210-228), as well as multiple letters and documents regarding his opinions as to plaintiff's diagnoses, limitations and disability status.  The first correspondence submitted to the agency, dated December 3, 1998, was a letter in which Dr. Cha listed plaintiff's history of ailments, but noted that he was not aware of plaintiff having any chest pain in 1998 (Tr. 167).  Dr. Cha went on to assess that plaintiff could "sit for 30 minutes several times a day;" "stand for 30 minutes several times a day;" "walk for 20 minutes several times a day;" and "lift 20 pounds and carry 20 pounds more than several times a day" (Tr. 167).  Dr. Cha also stated that

6

plaintiff's ability to travel is limited by her health; however, she has no problems with her memory, understanding, sustained concentration, persistence, social interaction and adaption (Tr. 167). Nevertheless, this work-up was apparently limited because plaintiff did not come for her follow-up (Tr. 167). The various ultrasound and radiology reports done in 1998 and 1999, dispersed among Dr. Cha's medical notes, reflect some spinal degenerative changes, no deep vein thrombosis and no active cardiac or lung disease (Tr. 158, 191-96).

The second document submitted by Dr. Cha in support of plaintiff's application for disability benefits was a "Medical Assessment To Do Work-Related Activities (Physical)," completed on November 28, 1999 (Tr. 172-74). This was a check-off answer form that provided space for more detailed responses. On this document, Dr. Cha noted, primarily through check marks, that plaintiff could lift and/or carry up to ten pounds frequently and occasionally; stand and/or walk for a total of one hour each day, ten minutes without interruption; sit for a total of two hours each day, ten minutes without interruption; could never climb, balance, stoop, crouch, kneel or crawl; was limited in her ability to reach, handle, push/pull and see; and was restricted from heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibration (Tr. 172-74). Each section asked Dr. Cha to identify what medical findings supported

7

his assessment for that particular limitation (i.e. physical exam findings, x-ray findings, laboratory test results, history, or symptoms) (Tr. 172). For the first question, Dr. Cha responded to this request by merely listing congestive heart failure, hypertension, obesity, diabetes mellitus Type II, palpitation, cervical disc disease and lumbar disc disease (Tr. 172). For each question thereafter, Dr. Cha simply referenced his previous answer (Tr. 173-74). When asked to state any other work-related activities affected by plaintiff's impairments, how they are affected and what medical findings support this assessment, Dr. Cha stated only, "I think she is disabled" (Tr. 174).

Dr. Cha completed another "Medical Source Statement Of Ability To Do Work-Related Activities (Physical)" on February 9, 2002 (Tr. 206-09). On this document, Dr. Cha again checked off plaintiff's limitations, and provided only a list of her alleged ailments (obesity, diabetes mellitus II, hypertension, congestive heart failure, depression, lumbar disc disease and degenerative disc disease) when asked for the medical clinical finding(s) that supported his conclusions (Tr. 206-209). The only changes from the form Dr. Cha completed in November 1999, were that plaintiff could lift and/or carry less than ten pounds frequently or occasionally; she could now kneel occasionally; and her speaking abilities were now limited (Tr. 206-08). However, Dr. Cha did not elaborate when the questions requested follow up to the

8

checked boxes (Tr. 207-09).  Notably, a second chest x-ray
performed on April 10, 2001, revealed no significant change since
the one performed in June 1999, and plaintiff's cardiovascular
status was still unremarkable with no active cardiac or lung
disease (Tr. 224).

On May 17, 2002, after plaintiff's second hearing
before the ALJ, Dr. Cha submitted a final letter in support of
plaintiff's claim for disability benefits (Tr. 230).  In this
letter, Dr. Cha enumerated all of plaintiff's alleged past and
current medical problems, including depression, pain, lumbar disc
disease, degenerative joint disease, exertional dyspnea, chronic
weakness and tiredness, chest pain, hypertension, congestive
heart failure, obesity, cholecystectomy, hysterectomy, kidney
stones and urinary tract infection (Tr. 230).  Dr. Cha went on to
state that plaintiff "has persistent depression and she is not
able to do anything at all for a long time" (Tr. 230).  He
further noted that she probably has sleep apnea, cannot lose
weight, and "is a helpless case with multiple medical problems
and she cannot function for anything.  She is totally disabled in
my opinion" (Tr. 230).

D.  Medical Records and Limitation Assessments from State Agency
Medical Consultants

At the request of the Commissioner, plaintiff underwent
a consultative examination on December 17, 1998 (Tr. 168-71).
During the examination, performed by Donita Keown, M.D.,

9

plaintiff reported a history of congestive heart failure, bilateral carpal tunnel syndrome, right knee pain, hypertension and degenerative disc disease (Tr. 168). Plaintiff also detailed a history of chest pain, which allegedly occurred once a week, during exertion, for a duration of approximately 30 seconds (Tr. 168). Plaintiff described the pain as dull and squeezing, sometimes accompanied by nausea but not shortness of breath or sweating (Tr. 168). Upon physical examination, range of motion of the cervical spine was intact and symmetrical; heart rate and rhythm were normal; there was some pitting edema in the left lower extremity, but no evidence of swelling in the other limbs (Tr. 169-70). Dr. Keown noted that plaintiff's swelling in only her left lower extremity is not consistent with the bilateral swelling normally seen with congestive heart failure (Tr. 170). Additionally, he found that plaintiff

> does not demonstrate any evidence of hepatic congestion, no evidence of an S3 on auscultation of the heart sounds, and no evidence of lateral displacement of the PMI or any evidence of jugular venous distention. Her description of chest pain is inconsistent with angina. She has a history of carpal tunnel. However, today's examination reveals no evidence in reduction in range of motion of the wrists or fingers, no evidence of a Tinel's sign or reduction in grip strength. She has full range of motion in the right knee, however, it is very uncomfortable and visual inspection of the knee shows no swelling, warmth or redness. With regard to the lower back, she is status post lumbar disk surgery in the remote past and shows a mild reduction in range of motion with an absence of straight-leg raise findings.

(Tr. 170-71).

There was a full range of motion in both shoulders, elbows, wrists[3], hands, hips, knees and ankles (Tr. 169-70). Plaintiff did exhibit a mild reduction in the range of motion of her thoracolumbar column, but showed no problems with straight or tandem walk or one-foot-stand (Tr. 170). Further, plaintiff exhibited motor strength of 5/5 in all extremities (Tr. 170).

A Physical Residual Functional Capacity ("RFC") Assessment was completed by a state agency medical consultant on December 21, 1998, in which plaintiff was assessed as being able to occasionally lift 20 pounds; frequently lift 10 pounds; sit, stand and/or walk about 6 hours in an 8-hour workday with normal breaks; push and/or pull without limitation; and climb, balance, stoop, kneel, crouch and crawl occasionally (Tr. 124-31). The medical consultant noted that there were no visual, communicative or environmental limitations established, and that this assessment was consistent with the treating/examining source conclusions about plaintiff's limitations at the time it was completed (Tr. 127-30). The medical consultant relied on plaintiff's records in making this assessment (Tr. 125-26). The following day, on December 22, 1998, Philip Lambert, the Disability Examiner and a Tennessee Department of Human Services

---

[3]There was no evidence of Tinel's sign in the left or right wrist (Tr. 170). A Tinel's sign is a "tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve[, which] indicates a partial lesion or the beginning regeneration of the nerve." Dorland's Illustrated Medical Dictionary 1527 (28th ed. 1994).

11

Vocational Specialist, concluded that the medical evidence in the file indicates that plaintiff had a light with occasional posturals RFC (Tr. 132). At the time, the vocational specialist opined that plaintiff could return to her past job as a special education teacher, as described in the national economy, and attached a copy of the relevant information from the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") (Tr. 132,134).

## E. Hearing Testimony

At her first hearing, held on December 6, 1999, plaintiff testified that she was limited by carpal tunnel syndrome, which she claimed got worse in some ways after the surgery (Tr. 238-39); congestive heart failure (Tr. 239-40); back pain (Tr. 240-41); blood pressure (Tr. 241-42); and diabetes (Tr. 242-43).

Plaintiff testified at her second hearing on April 23, 2002, that the limitations causing her to be disabled included carpal tunnel syndrome (Tr. 256); congestive heart failure (Tr. 257-58); degenerative disc disease (Tr. 258); uncontrolled high blood pressure (Tr. 258); and uncontrolled diabetes (Tr. 259-60). However, at the second hearing, plaintiff also alleged an onset of depression (Tr. 260-62); knee pain (Tr. 262) and sleep apnea (Tr. 266). With regard to daily chores, plaintiff stated that "[e]verything has to go at a slow pace now" (Tr. 263). Plaintiff

12

noted that whoever feels better, her husband or herself, will cook dinner, or they will just eat sandwiches; they both do the dishes, but she must lean on the sink; her husband does the laundry, makes the beds, vacuums, mops the floors, does the yard work and does most of the grocery shopping; but plaintiff can do minor straightening around the house or dusting (Tr. 263-65). Plaintiff also noted being able to drive short distances (approximately fifteen minutes each way (Tr. 265).

The vocational expert (VE) at plaintiff's second hearing, Jane Brenton, testified that plaintiff's past relevant work as a Special Education teacher would be medium and skilled, with those skills being transferable to light work (Tr. 269). The ALJ asked VE Brenton whether there are jobs for a person with a RFC to perform light work, which affords a sit/stand option, of plaintiff's age, education, and past relevant work (Tr. 269). VE Brenton stated that, at the light level, there wold be at least 5,000 teaching positions and at least 1,200 interview position in the State of Tennessee; and at an unskilled light level there would be at least 1,200 teachers aide positions (Tr. 269). VE Brenton stated that these positions would require frequent, but not repetitive gripping and grasping, and that her testimony is consistent with the DOT (Tr. 269-70). Upon questioning by plaintiff's counsel, VE Brenton acknowledged that if the ALJ adopted the restrictions in Exhibit 11F (Dr. Cha's February 9,

13

2002 Medical Source Statement) or in Exhibit 9F (Dr. Cha's November 28, 1999 Medical Source Statement), plaintiff would not be capable of performing light work (Tr. 270). Further, if adopted, the restrictions in Exhibit 11F would also prevent the performance of sedentary work (Tr. 271).

### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Secretary</u>, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  <u>Landsaw v. Secretary</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  <u>Her v. Commissioner</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  <u>Bell v. Commissioner</u>, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must

14

stand if substantial evidence supports the conclusion reached.

Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v. Secretary, 753 F.2d 517, 519 (6th Cir. 1985).

      B.   Proceedings at the Administrative Level

      The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant

_____

[4] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

15

can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See <u>Varley v. Secretary</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above,

16

the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. <u>See</u> 42 U.S.C. § 423(d)(2)(B).

C. <u>Plaintiff's Statement of Errors</u>

Plaintiff alleges error in the ALJ's decision to discount the opinions of her treating physician, Dr. Cha. She further alleges error in the ALJ's hypothetical questioning of the VE, again based on his failure to credit the limitations imposed by Dr. Cha. Finally, plaintiff alleges error in the ALJ's finding of her RFC for light work with a sit/stand option and a restriction from repetitive gripping. As explained below, the undersigned does not find error in the ALJ's treatment of Dr. Cha's opinions, but does find reversible error in other aspects of the administrative decision.

First, as regards Dr. Cha's assessments and treatment notes, it is clear that

> [t]he medical opinion of the treating physician is to
> be given substantial deference -- and, if that opinion
> is not contradicted, complete deference must be given.
> The reason for such a rule is clear. The treating
> physician has had a greater opportunity to examine and
> observe the patient. Further, as a result of his duty
> to cure the patient, the treating physician is
> generally more familiar with the patient's condition
> than are other physicians. It is true, however, that
> the ultimate decision of disability rests with the
> administrative law judge.

<u>Walker v. Sec'y of Health & Human Svcs.</u>, 980 F.2d 1066, 1070 (6th

17

Cir. 1992)(citations omitted).  Where the medical evidence is
contradictory, it is the ALJ's duty to resolve the conflict.  <u>See</u>
<u>id.</u>  In this case, Dr. Cha's assessments were rejected in light
of their vague, conclusory nature and the lack of any objective
signs, symptoms, or findings in his treatment notes which would
substantiate the limitations imposed in those assessments.  While
plaintiff complains that the ALJ merely dismissed the information
contained in Dr. Cha's treatment notes because he could not read
the script, the ALJ's decision makes clear that he "carefully
scrutinized" those notes despite their near illegibility (Tr.
19).  The undersigned finds no error in this treatment of Dr.
Cha's assessments.  <u>See</u>, <u>e.g.</u>, <u>Buxton v. Halter</u>, 246 F.3d 762,
773 (6th Cir. 2001)(noting that ALJ is not bound by opinions of
treating doctors that are conclusory and unsupported by "detailed
objective criteria and documentation")

        However, the undersigned does not find substantial
evidentiary support for the ALJ's finding of plaintiff's RFC.
After discounting the 1998, 1999, and 2002 assessments of Dr.
Cha, the ALJ was left with a relatively light medical record.  In
fact, the only items of medical evidence to which the ALJ gives
perceptible weight are the brief submission of orthopedists
Stanton and Starkweather, who diagnosed and treated plaintiff for
pes anserina bursitis in her right knee on two occasions in 1998
(Tr. 163-64), and the examination report of consulting physician

Case 3:04-cv-00241   Document 23   Filed 07/13/05   Page 18 of 23 PageID #: 18

Donita Keown, M.D. (Tr. 168-171). While Dr. Keown did note swelling in plaintiff's left leg and her complaints of pain in her chest, arms and hands, back, and "excruciating pain in the right knee with active range of motion," she also noted largely normal findings on range of motion, motor strength, and reflex examination. Plaintiff mistakenly argues that the ALJ rejected Dr. Keown's report, when in fact it appears that his RFC assessment is largely reliant on that report and its incorporation into the RFC assessment of a non-examining state agency physician (Tr. 124-131).[5]

Unfortunately, these reports, both rendered in December 1998, are simply not substantial evidence of plaintiff's condition through the date of the ALJ's decision in September 2002, particularly in light of the ALJ's recognition that between the dates of Dr. Cha's first assessment (in December 1998) and his second assessment (in November 1999), "the claimant had developed diabetes and X-ray evidence had shown degenerative changes in her cervical and lumbar spine" (Tr. 19), and the fact of her relatively recent diagnosis of sleep apnea. It thus appears that the 2002 assessments of Dr. Cha, while justifiably deemed unsupported on this record, were the only medical assessments which considered all of plaintiff's severe

_____

[5]Dr. Keown's report did not contain an assessment of plaintiff's remaining functional abilities.

impairments.  While the Appeals Council did not specifically direct the ALJ to order a second consultative examination in its remand of his first decision (Tr. 67-68), the undersigned concludes that it was incumbent upon the ALJ to do so in light of his recognition of objectively established conditions which were not considered in the RFC assessment he credits, and the Appeals Council's direction to "take any further action needed to complete the administrative record" (Tr. 68).

Moreover, the undersigned would note that the ALJ's treatment of plaintiff's subjective pain complaints is rather summary.  Without citing any of the language from the regulations governing his consideration of subjective pain complaints, the ALJ notes that these complaints "have likewise been considered under the appropriate rules and regulations".  However, his only references to factors deemed relevant in those rules and regulations include his recitation of her testimony as to almost nonexistent daily activities, and the fact that "[h]er pain has been treated with nonsteroidal anti-inflammatory medications, mild narcotics, and muscle relaxers." (Tr. 20).[6]  The ALJ then concludes that "[t]he objective evidence does not support the claimant's alleged level of pain..." (Id.).  Again, with the rejection of the more recent reports and assessments of

_____

[6]After describing plaintiff's medications, the ALJ notes that plaintiff is allergic to codeine (Tr. 20), and it appears that she is allergic to morphine as well (Tr. 162, 169), perhaps explaining her physician's prescription of less potent medications.

20

plaintiff's treating physician, the objective evidence of plaintiff's level of impairment at any time after 1998 is lacking.

In addition, the undersigned must note his concern with the jobs identified by the VE and utilized by the ALJ in attempting to meet his step five burden. While plaintiff was found incapable of returning to her past relevant work as a special education teacher (found to be medium work), the VE testified to the existence of teaching positions and teacher's aide positions at the light level of exertion which plaintiff could perform, as well as interviewer positions. However, when asked by the ALJ whether any of these jobs would require repetitive gripping and grasping, the VE responded that they would require frequent, but not repetitive, gripping and grasping (Tr. 270). This distinction between "frequent" and "repetitive" is presumably based on the definitions utilized in agency forms and other vocational resources, but it is not clear that Dr. McInnis in stating that "[s]he obviously needs some restrictions to avoid repetitive gripping with her hands" (Tr. 156) (or other sources in describing those limitations) was relying on the agency/industry definition of those terms. The undersigned would hope that, if upon remand plaintiff is again determined at step five of the sequential evaluation process to be so limited and yet not disabled, the government will have been able to adduce

21

evidence of jobs which require something less than "frequent" gripping and grasping.

Finally, the undersigned must express his distaste for recommending remand of this case nearly **seven years** after the filing of plaintiff's application for benefits. Realizing that the agency must deal with a tremendous volume of claims and appeals, it is nonetheless disturbing that between the two ALJ decisions rendered here, this case remained pending on plaintiff's notices of appeal to the Appeals Council alone for **2½ years**. While a judicial award of benefits would be inappropriate given the current state of the record, the undersigned would hope that on remand the case will proceed with all dispatch in view of its considerable age. It would further appear that plaintiff is entitled to be heard and have her case decided by a new ALJ, rather than the same ALJ who has twice denied her claim. It is so recommended.

### IV.   RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **GRANTED**, and that the decision of the Commissioner be **REVERSED** and the cause **REMANDED** for further administrative proceedings, to include rehearing, supplementation of the medical record, and the issuance of a new decision. Should this recommendation be

adopted and approved, it is further recommended that the case proceed on remand before a different Administrative Law Judge.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this the 12th day of July, 2005.

_/s/_____
JOE B. BROWN
United States Magistrate Judge

23